J-S31007-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JOSEPH CEDENO, | |
| Appellant | No. 1770 MDA 2014 |

Appeal from the Judgment of Sentence May 15, 2014
In the Court of Common Pleas of Lackawanna County
Criminal Division at No(s): CP-35-CR-0002409-2012

BEFORE:  BENDER, P.J.E., ALLEN, J., and WECHT, J.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED JULY 10, 2015**

Appellant, Joseph Cedeno, appeals from the judgment of sentence of life imprisonment and a consecutive term of 20-40 years' incarceration, following his conviction for first and third degree murder.  After careful review, we conclude that Appellant's multiple claims do not entitle him to relief.  However, we vacate Appellant's sentence for third degree murder, because we hold the crimes of first and third degree murder always merge for sentencing purposes when those offenses involve an individual defendant's killing of the same person.

On September 23, 2012, after drinking together all day, Appellant and the victim arrived at the home of Louise Lambides, Appellant's mother, on Hospital Street in Carbondale, Pennsylvania.  The victim was a family friend

who had also been friends with Appellant's then-deceased sibling, James Spinelli.

One of Appellant's surviving brothers, Jonathon Sandoval, arrived at the home after Appellant and the victim were already there. He overheard Appellant repeatedly asking Lambides, "should I do it?" Initially, Sandoval did not know what Appellant was talking about until Appellant asked to have a word with him in private. Sandoval took Appellant into his room and asked him what he wanted. Appellant then asked Sandoval if Appellant should kill the victim. When Sandoval asked Appellant why he would want to do such a thing, Appellant told him that that he believed that the victim might have had something to do with James Spinelli's death. Appellant also told Sandoval that he planned to kill the victim by "carv[ing] him up real nice and slit[ting] his throat from ear to ear." N.T., 5/14/14, at 106. Sandoval begged Appellant not to do anything, told Appellant that he had no proof that the victim was involved in James Spinelli's death, and made Appellant promise him that he would not harm the victim.

Eventually, Appellant and the victim left, purportedly so that Appellant could escort the victim to his home. Appellant later returned alone and told his mother that he had killed the victim. He took a knife out of his pocket, washed it in the sink, and put it into a drawer in the kitchen. Appellant also told Michael Spinelli, another of his brothers, that he had just 'caught a body,' *i.e.*, that he had killed someone. Sandoval heard Appellant say that he had done it for their deceased brother, James Spinelli.

Police found the victim's body in a nearby parking lot. The victim died as a result of numerous stab wounds to his torso. Police recovered the knife that Appellant placed in the kitchen drawer, and subsequently discovered that it still had traces of the victim's DNA on it. Additionally, tears in the victim's fleece pull-over were consistent with having been caused by the knife. Dr. Ross, who performed the victim's autopsy, testified that the victim's wounds were consistent with having been caused by that knife or something similar.

Jacob Huff, an inmate at the Lackawanna County Jail at the same time as Appellant following Appellant's arrest, testified that Appellant admitted to him that he had stabbed the victim to death. Huff's testimony regarding Appellant's admissions revealed details of the incident that were consistent with the details provided by the Commonwealth's other witnesses.

Following a trial held on May 13-15, 2014, the jury found Appellant guilty of both first and third degree murder. The trial court subsequently sentenced Appellant to a mandatory term of life imprisonment for first degree murder and to a consecutive term of 20-40 years' incarceration for third degree murder. Appellant filed post-trial motions, which were denied by the trial court on September 30, 2014. Appellant filed a timely notice of appeal on October 16, 2014. He filed a court-ordered Pa.R.A.P. 1925(b)

statement on October 29, 2014. The trial court issued its Rule 1925(a)

opinion on December 2, 2014.[1]

Appellant now presents the following questions for our review:

A. Whether the Commonwealth presented sufficient evidence establishing that [] Appellant is guilty beyond a reasonable doubt of first degree the murder and third degree murder of Dennis Doherty?

B. Whether the verdict was against the weight of the evidence?

C. Whether the lower court erred in denying [] Appellant's pre-trial motion to produce the testimony of Dr. Matthew Berger, a psychiatric expert whom the lower court appointed in this matter to conduct an independent psychiatric evaluation of Appellant?

D. Whether the lower court erred in denying [] Appellant's request to submit evidence as to his blood alcohol level at the time of his incriminating statement to his family members?

E. Whether the lower court erred in allowing the Commonwealth to redirect Dr. Gary Ross?

Appellant's Brief, at 4.

## Sufficiency

Appellant's first claim concerns the sufficiency of the evidence

supporting his conviction. Specifically, Appellant believes that the evidence

did not support his identity as the victim's assailant—a common element to

each of his homicide convictions. Our standard of review of sufficiency

claims is well-settled:

---

[1] The trial court's Rule 1925(a) opinion incorporated its September 30, 2014 memorandum opinion addressing Appellant's post-sentence motion claims.

- 4 -

A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000) (internal citations omitted).

Appellant "submits that the record is completely void of any physical evidence linking him to the murder of Dennis Doherty." Appellant's Brief, at 16. Appellant's claim is unsustainable in both fact and law. The police discovered the victim's DNA on a knife that was seen in Appellant's possession immediately after the homicide occurred; therefore, there was, in fact, physical evidence tying Appellant to the murder of the victim.

In any event, evidence of guilt is not insufficient merely due to the absence of physical evidence. "It is well established in Pennsylvania that circumstantial evidence alone may be sufficient to determine commission of a crime and convict the accused of it." *Commonwealth v. Cox*, 333 A.2d 917, 918 (Pa. 1975); *see also Commonwealth v. Wentzel*, 61 A.2d 309, 312 (Pa. 1948) ("Circumstantial evidence is, in the abstract, nearly, though perhaps not altogether, as strong as positive evidence; in the concrete, it may be infinitely stronger.") (quoting *Commonwealth v. Harman*, 4 Pa.

269, 271 (1846)). Thus, even if there were a lack of physical evidence in this case, Appellant's sufficiency claim lacks any legal foundation, as the absence of physical evidence cannot, by itself, render alternative forms of evidence insufficient to sustain a conviction.

To the extent that Appellant presents inconsistencies between the testimony of the Commonwealth's witnesses and other evidence as a challenge to the sufficiency of the evidence, we note that such arguments go to the weight, and not the sufficiency, of the evidence. "A mere conflict in the testimony does not render the evidence insufficient … because it is within the province of the fact finder to determine the weight to be given to the testimony and to believe all, part, or none of the evidence." ***Commonwealth v. Mechalski***, 707 A.2d 528, 530-31 (Pa. Super. 1998) (internal citations omitted). For these reasons, we conclude that Appellant's sufficiency claim lacks merit.

### **Weight**

Next, Appellant challenges the trial court's denial of his claim that the verdict was against the weight of the evidence. Specifically, Appellant contends that the weight of the evidence "pointed to someone other than him as Doherty's attacker." Appellant's Brief, at 28.

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:
>
> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained:

The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (internal citations omitted).

The trial court determined that the verdict was not against the weight of the evidence. To the contrary, the trial court found that "the amount of evidence implicating [Appellant] is so overwhelming that the failure to convict would shock any reasonable person's sense of justice." Trial Court Opinion (TCO), 9/30/14, at 7. We agree.

Appellant asserts that the absence of certain evidence supports his weight-of-the-evidence claim, an argument that is as illogical as it is unconvincing, as it purposefully overlooks the ample evidence supporting his conviction. Appellant foreshadowed his crime by asking his brother if he should kill the victim just before the killing occurred. Appellant returned to his mother's home shortly after departing with the victim, and immediately admitted to his mother that he killed the victim. DNA samples taken from the knife that Appellant cleaned and put away in his mother's kitchen while admitting to killing the victim revealed the presence of the victim's DNA. These facts overwhelming outweigh minor inconsistencies in an eyewitness's testimony regarding the murderer's description.[2] Accordingly, the trial court clearly did not abuse its discretion in denying Appellant's post-sentence weight-of-the-evidence motion. Thus, Appellant's weight-of-the-evidence claim is meritless.

_____

[2] Georgia Strackbein, who witnessed the killing from her home, told police that the perpetrator was about 5 feet, 9 inches tall, and wore a dark hoodie. She did not observe the assailant using a knife. Appellant is 6 feet, 2 inches tall, and the jacket purportedly worn by him that evening was not hooded. However, the specific details of Strackbein's testimony were questionable in light of her vantage point. Strackbein claimed to have observed the killing from a distance of 70 feet; however, other evidence revealed that her home was at least 75 yards away from the scene of the crime. Given that her observations were made in the evening and from such a considerable distance, a five inch discrepancy between her description and Appellant's height appears trivial, as does her description of the assailant's clothing. It also explains her failure to observe a knife, and the evidence clearly established that the victim was stabbed to death.

## Psychiatric Testimony

Next, Appellant claims that the trial court erred when it denied his pre-trial motion to produce the testimony of a psychiatrist, Dr. Matthew Berger.[3] Appellant contends that Dr. Berger would have testified that Appellant suffers from schizoaffective disorder with psychotic features, a mental illness that can cause hallucinations. Appellant contends that he was suffering an acute manifestation of this disorder, complicated by his intoxication, when he stated to his family members that he had killed the victim. Appellant believes that this evidence was relevant to demonstrate that Appellant was "not in the proper frame of mind to be able to make a knowing, voluntary, and intelligent confession." Appellant's Brief, at 30. He argues that "[t]he purpose of this testimony would be to provide the jury with evidence as to Appellant's state of mind at the time he made the statements so that the jury could determine what weight, if any, to give to the alleged confessions[.]" *Id.*

We apply the following standard in our review of claims that a trial court erred in the admission or exclusion of evidence:

> The admission of evidence is solely within the province of the trial court, and a decision thereto will not be disturbed absent a showing of an abuse of discretion. "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is

---

[3] Appellant similarly challenges the trial court's granting of the Commonwealth's motion to preclude Dr. Berger's testimony.

manifestly unreasonable, or the result of partiality, prejudice, bias[,] or ill-will discretion ... is abused."

*Commonwealth v. Murray*, 83 A.3d 137, 155-56 (Pa. 2013) (internal citations omitted).

The trial court provides important context for this claim as follows:

> The defense team had two psychiatric experts examine [Appellant] in anticipation of raising various defenses in the case. After the evaluations were completed, at a January 10, 2014 status conference, [Appellant]'s attorneys indicated that [Appellant] would not raise the defense of voluntary intoxication. On January 24, 2014, [Appellant] filed a notice of expert evidence of mental condition, and attached a report by Dr. Matthew Berger. He indicated that the testimony was necessary to show his state of mind when he made the inculpatory statements to his family members. On May 8, 2014, the Commonwealth filed a motion in limine to preclude the testimony of Dr. Berger. Prior to trial, the court granted this motion and [Appellant] filed a motion for reconsideration. On the morning of trial, argument was heard on the motion for reconsideration and the motion was denied.

TCO, at 8-9.

In refusing to permit his testimony at trial, the trial court determined that Dr. Berger's report "did not discuss whether [Appellant's diagnoses of schizoaffective disorder and substance abuse] prevented [Appellant] from forming specific intent, or whether it affected the statements he made to his family members on the night of the murder." TCO, at 9. Therefore, as Dr. Berger did not address an insanity or guilty but mentally ill defense, or otherwise offer facts that could negate the specific intent element of first

degree murder, the trial court precluded his testimony based on several authorities,[4] which collectively set forth the following standards of law:

> A diminished capacity defense does not exculpate the defendant from criminal liability entirely, but instead negates the element of specific intent. For a defendant who proves a diminished capacity defense, first-degree murder is mitigated to third-degree murder. To establish a diminished capacity defense, a defendant must prove that his cognitive abilities of deliberation and premeditation were so compromised, by mental defect or voluntary intoxication, that he was unable to formulate the specific intent to kill. The mere fact of intoxication does not give rise to a diminished capacity defense. Evidence that the defendant lacked the ability to control his or her actions or acted impulsively is irrelevant to specific intent to kill, and thus is not admissible to support a diminished capacity defense. Furthermore, diagnosis with a personality disorder does not suffice to establish diminished capacity.

**Hutchinson**, 25 A.3d at 312 (quotation marks and citations omitted).

Appellant does not challenge the trial court's rejection of Dr. Berger's testimony based upon a theory that it could have provided a diminished capacity defense to negate the specific intent element of first-degree murder. Instead, Appellant claims an alternative basis for admitting Dr. Berger's testimony: that it was relevant to the question of whether

---

[4] In its opinion, the trial court cites the following authorities in support of its ruling: **Commonwealth v. King**, 57 A.3d 607 (Pa. 2012); **Commonwealth v. Vandivner**, 962 A.2d 1170 (Pa. 2009); **Commonwealth v. Sheppard**, 648 A.2d 563 (Pa. Super. 1994); and **Commonwealth v. Faulkner**, 595 A.2d 28 (Pa. 1991). The principles of law set forth in those authorities are aptly summarized by **Commonwealth v. Hutchinson**, 25 A.3d 277 (Pa. 2011).

Appellant's "confession" to family members was knowing, voluntary, and intelligent, citing *Commonwealth v. Jones*, 327 A.2d 10 (Pa. 1974).

In *Jones*, the defendant purportedly participated in a violent assault and robbery at a subway station in downtown Philadelphia that led to the death of the victim. Jones was arrested less than two hours later, after he was caught snatching a purse from a different victim. The next morning, Jones signed a nine page confession in which he admitted to beating and robbing the first victim and then throwing him onto the subway tracks. Jones unsuccessfully contested the voluntariness of his confession in a suppression motion. However, "[a]t trial, [Jones] renewed his attack on the confession by offering the testimony of a psychiatrist concerning his … sub-normal mental capacity and lack of verbal facility, and his consequent inability to have given the confession which the Commonwealth attributed to him." *Id.* at 12. The trial court refused to allow that evidence. Our Supreme Court granted Jones a new trial based on that refusal, holding that "psychiatric testimony concerning a defendant's mental capacity and condition at the time of giving an alleged confession is admissible on the issue of his ability to give the confession." *Id.* at 13.

Appellant maintains that *Jones* is binding in this matter. The trial court rejected this argument, finding significant factual differences upon which to distinguish this case from *Jones*. For instance, in *Jones*, the defendant's counsel

indicated that the purpose of the offer of proof was an attempt to 'minimize the impact of the defendant's confession.' The gist of the psychiatrist's testimony, he said, would be that, in light of the defendant's mental capacity, his I.Q. and lack of verbal facility, defendant would have been incapable of giving a statement of the length and continuity of the one allegedly given by the defendant to the police. Counsel indicated that the psychiatrist would testify that in his opinion the interrogating detective had interjected questions which were not reflected in the statement. He further stated that the purpose of the psychiatrist's testimony would be to show that the defendant had an I.Q. of 71 and was a mild mental defective, and that 'these points would be important to the jury's evaluation of the defendant's statement.'

*Id.* at 12.

Here, however, Appellant's statement was neither made to police, nor did it occur in a potentially coercive setting. Another crucial difference is that Appellant's inculpatory statements to family members were relatively simple and uncomplicated. As the trial court recognized:

Here [Appellant] made admissions to his mother and two of his brothers that he was going to murder the victim and that he had murdered the victim. Unlike the nine-page written confessions in *Jones*, these statements were more in the nature of excited utterances. [Appellant] does not assert that he was incapable of making the utterances, but rather than the jury should have heard psychiatric testimony as to his "state of mind" when he made them. However, Dr. Berger's report does not discuss the effect that [Appellant]'s drug and alcohol use or schizoaffective disorder had on his ability to make statements about what he had done. Thus, *Jones* does not apply here, and Dr. Berger's psychiatric testimony was properly excluded.

TCO, at 11.

We agree with the trial court's analysis. Additionally, Appellant has not offered, and our own research has not uncovered, any case law that explicitly or implicitly extends *Jones*' holding beyond the factual context of a

formal confession where the confessor's capacity to author an extensive written confession is plausibly at issue. Here, Appellant's inculpatory statements were spontaneous, self-originating, unadorned, and not made to police in an inherently coercive setting. Accordingly, we conclude that trial court did not abuse its discretion when it refused to admit Dr. Berger's testimony for the purpose of providing state-of-mind context to Appellant's inculpatory statements.

### Blood-Alcohol Content

Next, Appellant claims the trial court erred when it denied his request to present evidence of his blood-alcohol level at the time he made the incriminating statements to his family members. Appellant admits that he did not seek to admit this evidence in order to negate specific intent as part of a voluntary intoxication defense. Instead, as with the precluded testimony of Dr. Berger, Appellant intended to offer evidence of his intoxication in order to demonstrate his state of mind when he made the at-issue inculpatory statements.

The trial court determined that "[b]ecause [Appellant] decided not to raise a voluntary intoxication defense, the court precluded expert testimony concerning his blood alcohol level." TCO, at 12. Additionally, the Commonwealth contends that any error in the preclusion of expert testimony concerning Appellant's degree of intoxication was harmless. Because we agree that *any* resulting error was harmless, we need not consider whether the trial court's decision was erroneous.

- 14 -

Harmless error exists if the record demonstrates either: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted [or precluded] evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted [or precluded] evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

***Commonwealth v. Hawkins***, 701 A.2d 492, 507 (Pa. 1997).

Here, there was "a great deal of testimony at trial from eye witnesses concerning the amount of alcohol consumed by [Appellant] on the night of the murder, and his level of intoxication." TCO, at 12. For instance, Appellant's mother testified that Appellant and the victim were drinking beer and vodka before the killing, N.T., 5/13/14, at 170; that they "were drinking all day[,]" *id.* at 179, and that between them, Appellant and the victim consumed a considerable portion of a half-gallon bottle of vodka, *id.* at 180.[5] She also testified that Appellant appeared intoxicated, slurred his words and bumped into things as he walked through her home. *Id.* at 182.

Michael Spinelli also observed Appellant drinking on the night of the killing. *Id.* at 148. He stated that Appellant was speaking loudly that evening, a typical behavior for Appellant when intoxicated. *Id.* at 151-52. Spinelli also testified that Appellant was "say[ing] things that he normally [would] say if he was drinking." *Id.* at 156. Spinelli also agreed during

---

[5] The bottle of vodka was half-full when the two arrived, and nearly empty at the time of the killing. Appellant's mother stated that she was unsure how much the pair had consumed before arriving at her home.

cross-examination that, when drinking, Appellant "makes statements that don't make much sense." *Id.* at 157. Jonathan Sandoval also testified that Appellant was intoxicated. N.T., 5/14/14, at 114.

During closing argument, defense counsel focused extensively on Appellant's level of intoxication and erratic behavior. In addition to the aforementioned testimony, he suggested to the jury that they could infer Appellant's level or degree of intoxication at the time he made his inculpatory statements to his family from the victim's blood alcohol concentration that evening—a staggering .42. The trial court overruled the Commonwealth's objection to this suggestion, explaining, "The testimony was that they were drinking together. So it is fair argument." *Id.* at 210. Additionally, the trial court instructed the jury that, "Evidence regarding [Appellant's] drinking can be used by you when evaluating [his] statements made to any individuals on the night of the alleged crime." N.T., 5/15/14, at 22. Thus, we agree with the trial court that the "jury was aware of [Appellant]'s high level of intoxication on the night of the murder, and [that] the court instructed them that they could consider it when determining his state of mind in admitting the murder to his family members." *Id.*

As such, we concur with the Commonwealth that the preclusion of evidence of Appellant's specific blood alcohol level was "merely cumulative" of the other evidence produced at trial. *Hawkins*, *supra*. Appellant was permitted to cross-examine the Commonwealth's witnesses in order to extract substantial evidence of his intoxication when he made the

inculpatory statements to those witnesses. ***See Soda v. Baird***, 600 A.2d 1274, 1277 (Pa. Super. 1991) ("The exclusion of evidence is not grounds for the granting of a new trial if evidence of the same fact or facts was introduced by the party applying for a new trial. There is no basis for a reversal, and a new trial, if the excluded evidence was cumulative in nature.") (citation omitted). Accordingly, we conclude that even if the trial court erroneously excluded evidence of Appellant's blood-alcohol content at the time he made his incriminating statements, such error was harmless.

### Re-direct of Dr. Ross

Finally, Appellant asserts that the trial court erred when it permitted the Commonwealth to question Dr. Gary Ross on re-direct. Dr. Ross, a forensic pathologist, testified regarding the autopsy and toxicology report. He spoke to both the cause and mechanism of the victim's death. During direct examination, Dr. Ross was questioned about the knife that Appellant pulled out of his pocket and placed in his mother's kitchen drawer. He stated, over Appellant's overruled objection that it went beyond the scope of his report, that "[a] knife just like this could have caused all the injuries that this decedent had sustained." N.T., 5/14/14, at 162. Appellant's claim, however, does not arise directly from his objection to this testimony.

During cross-examination, defense counsel questioned whether Dr. Ross could testify with any degree of certainty whether that *specific* knife had been used to kill the victim, as opposed to a similar knife, and Dr. Ross stated that he could not from the information that he had at that moment.

*Id.* at 171. During re-direct, the Commonwealth asked Dr. Ross, "If you had information that the decedent's DNA was on that knife, what would your opinion be?" Defense counsel objected, essentially arguing that the question went beyond the scope of his cross-examination of Dr. Ross. The Commonwealth responded that Appellant had opened the door to that line of inquiry. The trial court agreed, and overruled the objection. Dr. Ross then stated that if he knew that the decedent's DNA was found on the knife, he "would be very comfortable in saying that this knife is the knife that killed [the vicitm]." *Id.* at 172-73.

Appellant argues that the trial court erred by permitted the Commonwealth's solicitation of Dr. Ross's opinion regarding a fact not contained in his report. We disagree. Initially, we note that Appellant fails to provide citation(s) to any authority that would suggest that the Commonwealth's question on re-direct was improper. In any event, we view the Commonwealth's question on re-direct to be a natural and fair response to the focus of Appellant's questions during cross-examination. By focusing the jury's attention on Dr. Ross's inability to identify the knife as the actual or specific cause of the victim's stab wounds, it was fair response for the Commonwealth to highlight what facts, if any, would bridge the gap between the actual and the definite. Moreover, the question did not involve mere speculation that would mislead the jury—DNA samples taken from the blood found on the knife in question were, in fact, positively matched to the victim in this case. N.T., 5/14/14, at 91-93. Accordingly, we conclude that the

- 18 -

trial court did not err when it permitted the Commonwealth to pursue its line of questioning during the re-direct examination of Dr. Ross.

**Merger/Illegal Sentence**

Having addressed each of Appellant's claims, we now turn to an obvious error that is apparent from the record. Specifically, Appellant was illegally sentenced when the court issued consecutive sentences for first and third degree murder. There is no dispute in this case that Appellant's convictions for these crimes were based on his killing of one victim: Dennis Doherty. Appellant was not charged with killing separate individuals, nor did the Commonwealth present evidence of multiple homicides. Therefore, his convictions for first and third degree murder should have merged for sentencing purposes, rendering his current sentence illegal.

> "A challenge to the legality of the sentence may be raised as a matter of right, is non-waivable, and may be entertained so long as the reviewing court has jurisdiction." **Commonwealth v. Robinson**, 931 A.2d 15, 19–20 (Pa. Super. 2007) (*en banc*). The phrase 'illegal sentence' is a term of art in Pennsylvania Courts that is applied to three narrow categories of cases. **Id.** at 21. Those categories are: "(1) claims that the sentence fell 'outside of the legal parameters prescribed by the applicable statute'; (2) claims involving merger/double jeopardy; and (3) claims implicating the rule in **Apprendi v. New Jersey**, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)."

**Commonwealth v. Munday**, 78 A.3d 661, 664 (Pa. Super. 2013). Moreover, "[t]he issue [of merger] is a pure question of law, allowing for plenary review." **Commonwealth v. Pettersen**, 49 A.3d 903, 911 (Pa. Super. 2012).

- 19 -

Despite Appellant's failure to raise this claim below or in his appellate brief, the issue of whether the trial court failed to merge Appellant's sentences for first and third degree murder cannot be waived, and this Court may address it *sua sponte*. **Munday**. The merger statute dictates as follows:

> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S. § 9765.

Here, it is beyond question that Appellant's convictions for first and third degree murder arise from the same criminal act—the killing of Dennis Doherty. One may be assaulted multiple times, or be the victim of multiple thefts; but once completed, a killing can never be repeated against the same victim (although multiple persons may be held legally culpable for a single killing). Thus, we have no reservation in concluding that Appellant's sentences for first and third degree murder "arise from a single criminal act." **Id.**

We must next determine whether "all of the statutory elements of one offense are included in the statutory elements of the other offense." **Id.** First-degree murder occurs when "(1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill." **Commonwealth v. Martin**,

101 A.3d 706, 718 (Pa. 2014). For purposes of this analysis, these elements can be rearranged as such: a defendant is guilty of first-degree murder if he (1) unlawfully kills another human being; (2) with malice aforethought; and (3) with the specific intent to kill.

Recently, our Supreme Court approved of the following definition of third-degree murder: "[T]o convict a defendant of the offense of third[ ]degree murder, the Commonwealth need only prove that the defendant killed another person with malice aforethought." *Commonwealth v. Fisher*, 80 A.3d 1186, 1191 (Pa. 2013) (quoting *Commonwealth v. Santos*, 876 A.2d 360, 363 (Pa. 2005)), *cert. denied sub nom. Best v. Pennsylvania*, 134 S.Ct. 2314 (2014). Again, rearranging this definition for our analysis, a defendant is guilty of third degree murder if he (1) unlawfully kills another human being; (2) with malice aforethought.

As is clear from these rearranged (but substantively unaltered) definitions, "all of the statutory elements of" third degree murder "are included in the statutory elements of" first degree murder. 42 Pa.C.S. § 9765. Furthermore, as discussed *supra*, we have determined that Appellant's first and third degree murder convictions both arose from the same criminal act. Thus, Appellant's first and third degree murder convictions must merge for sentencing purposes. Indeed, these offenses will always merge for sentencing purposes when they both pertain to an individual defendant's killing of single person.

Consequently, we hereby vacate Appellant's sentence for third degree murder. Because the Commonwealth never sought imposition of the death penalty in this case, the only possible sentence for Appellant's first degree murder conviction is life imprisonment without the possibly of parole, a sentence already imposed and left untouched by this decision. Thus, it is unnecessary to remand for re-sentencing, and Appellant is not entitled to any other form of relief.

Judgement of sentence **affirmed** in part, **vacated** in part. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/10/2015